A01A0546. CANNON et al. v. JEFFRIES et al.
(551 SE2d 777)

SMITH, Presiding Judge.

This medical malpractice case arose from the death of a very premature (25 weeks gestation) infant at Crawford Long Hospital. The mother, Cynthia Cannon, brought this action in her own right and as next friend of Demetrio Robbins, the deceased infant. The complaint named as defendants Dr. M. Dwaud Jeffries, the mother's obstetrician, Sondra Abdullah-Zaimah, the nurse-midwife, and Southside

---

OB-GYN Associates, P.C., the doctor's corporation.[1] Defendants moved for summary judgment on the issues of causation and standard of care. The trial court granted summary judgment in a well-written and thoughtful order, addressing particularly the two areas of alleged malpractice supported by the expert's affidavit. Cannon appeals. Because it is plain from the expert's deposition that Cannon has failed to show causation with respect to one allegation of negligence or a breach of the standard of care with respect to the other, we affirm.

Dr. Salvino, Cannon's expert, originally gave as her opinion in her affidavit pursuant to OCGA § 9-11-9.1: (1) that Dr. Jeffries was negligent in failing to test for a chlamydia infection in the mother and that this failure "may have contributed to the premature rupture of membranes"; and (2) that Dr. Jeffries was negligent in delaying an emergency cesarean section and that the delay "causally contributed to the death of the newborn child, which was caused by hypoxia." On her deposition, however, Dr. Salvino substantially qualified her opinions based upon other facts in the case that apparently were not known to her at the time she made her affidavit.

1. We first address the trial court's conclusion that Cannon failed to show causation on the issue of chlamydia testing. Asked if she could testify to a reasonable degree of medical certainty what factor caused Cannon's preterm labor, Dr. Salvino responded that she could identify "the two things that I think may have. Can I tell you exactly, nobody can." Later in her deposition, asked if she could tell to a reasonable degree of medical certainty that chlamydia caused the preterm labor, she responded, "No, sir, but I can't tell you it's not either." She was unwilling to "give . . . an exact number" with regard to the increased risk caused by a chlamydia infection. Although chlamydia might have caused premature labor, Dr. Salvino also testified that she "would not be very surprised given the way this thing evolved to find that this woman had an incompetent cervix." Cannon had "a history of two elective abortions and of a cervical surgery, both of which are risk factors for weakening of the cervix." She also testified that the "largest category of preterm labor" is idiopathic, that is, a condition for which there is no known cause.

In order to recover for medical malpractice under OCGA § 51-1-27, a plaintiff must show three essential elements:

> (1) the duty inherent in the doctor-patient relationship; (2) breach of that duty by failing to exercise the requisite degree of skill and care; and (3) that this failure be the proximate

---

[1] The nurse-midwife was dismissed from this action with prejudice before summary judgment.

cause of the injury sustained. Negligence alone is insufficient to sustain recovery. It must be proven that the injury complained of proximately resulted from such want of care or skill. A bare possibility of such result is not sufficient. Additionally, there can be no recovery for medical negligence involving an injury to the patient where there is no showing to any reasonable degree of medical certainty that the injury could have been avoided. Although it is not necessary for the plaintiff's experts to use the magic words "reasonable degree of medical certainty" in describing the decedent's prospect of survival with appropriate treatment, such prospect must be more than a mere chance or speculation. Instead, there must be a realistic assessment of the likelihood that the alleged negligence caused the injury or death.

(Citations, punctuation, footnote and emphasis omitted.) *Anthony v. Chambless*, 231 Ga. App. 657, 659 (1) (500 SE2d 402) (1998). "When the expert testimony, alone and unsupported by other evidence, indicates that the causal connection is something less than reasonable medical probability," this is insufficient to render the physician liable. *Estate of Patterson v. Fulton-DeKalb Hosp. Auth.*, 233 Ga. App. 706, 709 (2) (505 SE2d 232) (1998). See also *Grantham v. Amin*, 221 Ga. App. 458-459 (471 SE2d 525) (1996) (" 'significant contributing cause' " insufficient to establish causation). While Cannon relies upon *Patterson* for the principle that expert testimony may state a "possibility" of causation, this is only when the expert testimony is considered in conjunction with "other medical or non-medical evidence that, in totality, shows causation, even though the medical opinion is weak, i.e., showing a reasonable possibility rather than a probability." *Patterson*, supra at 710 (2).

Here, no other evidence was presented. The expert's deposition testimony demonstrates that neither she nor anyone else, in her opinion, could establish to a reasonable degree of medical certainty what caused Cannon's preterm labor. She was able to state only that she *thought* two possibilities *may have contributed*: the chlamydia infection and an incompetent cervix. She was unwilling to state a percentage of probability. Moreover, she acknowledged that the "largest category" of preterm labor has no identifiable cause. This testimony fails to establish causation under the applicable Georgia standard, and the trial court did not err in so holding.

2. We next address the trial court's conclusion that Cannon failed to demonstrate a deviation from the standard of care with respect to Jeffries's alleged delay in ordering a cesarean section. At the time of the events in question, Dr. Jeffries was not at the hospital and was reached by telephone on two occasions. Although Cannon

asserts negligence in Dr. Jeffries's response to his 7:10 p.m. telephone conversation with the hospital, Dr. Salvino did not find any negligence regarding this second telephone conversation, or indeed in any of Dr. Jeffries's conduct after the first telephone conversation, so it is only that conversation, at 1830 hours or 6:30 p.m., that concerns us here.

As the trial court correctly noted, in her deposition Dr. Salvino stated that Dr. Jeffries was negligent in failing to order an immediate cesarean at 6:30 p.m. if he was made aware of the following facts in the telephone call: the fetal monitor showing several sharply variable decelerations, an overall loss of variability, then multiple decelerations and loss of fetal heart tones.[2] According to Dr. Salvino, these fetal monitor readings are "worrisome." In her opinion, by 6:30 the infant was in "distress" or "serious trouble." But Dr. Salvino specifically testified that if Dr. Jeffries was told only that the patient's membranes had ruptured and that she was having contractions, she had no criticism of his decision to order a drug to decrease or stop the contractions at that time.

The only direct evidence of what Dr. Jeffries was told is Dr. Jeffries's testimony that he spoke with Nurse Wharton at 6:30 p.m. and that she told him Cannon "had ruptured membranes and that she was having some contractions." She also told him that Cannon was one to two centimeters dilated but gave him no other information. He ordered Nurse Wharton "to give her the Terbutaline to see if we could stop the contractions." Dr. Jeffries also specifically testified that at 6:30 Nurse Wharton told him that "the fetal heart tones were okay."

Dr. Salvino acknowledged that the nurse's notes do not show what report was provided to Dr. Jeffries at 6:30 p.m. She testified that she was "not sure who to be critical [of] at that point. This baby was in distress at that point. Whether Dr. Jeffries knew that or not is not clear from the record."

Nurse Wharton was unable to recall whether she had spoken with Dr. Jeffries or another nurse assisting her had done so. While she testified that it was standard procedure to relay any information regarding the patient to the doctor in such calls, she did not recall whether that was done. She pointed out that "[t]he person may not have all the information. They would have some of the information, but they wouldn't necessarily have all the information. . . . Some of the information may be happening while they're on the telephone." On further questioning, she reiterated that she did not recall speak-

---

[2] Although Cannon continues to argue in her brief that the fetal monitor had "lost heart tones" for three and one-half minutes before the conversation with Dr. Jeffries, the testimony of Dr. Salvino is clear that this occurred because the resident was performing an ultrasound and had removed the fetal monitor.

ing to Dr. Jeffries and did not recall if the fetal monitoring results were relayed to him.

"[I]t is a long-standing rule that a finding of fact which may be inferred but is not demanded by circumstantial evidence has no probative value against positive and uncontradicted evidence that no such fact exists. [Cits.]" *Johnson v. Rogers*, 214 Ga. App. 557, 559 (2) (448 SE2d 710) (1994). See also *Winder v. Paul Light's Buckhead &c. Plymouth*, 249 Ga. App. 707 (549 SE2d 515) (2001). Nurse Wharton's testimony that it was standard procedure to relay any information to the doctor, while permitting an inference that Dr. Jeffries was informed of fetal distress during the 6:30 p.m. telephone call, cannot stand against Dr. Jeffries's positive testimony that the information was not provided. In addition, Nurse Wharton qualified her testimony by stating that all the information may not have been available to the person on the telephone.

Cannon also relies on a summary note prepared by the resident at the hospital to contend that Dr. Jeffries was told about fetal distress by Nurse Wharton. Dr. Salvino, on the other hand, stated that it was her "understanding" from the summary note that the *resident* on duty was the individual who spoke with Dr. Jeffries and gave him the information that fetal heart tones were "nonreassuring." But there is no testimony to that effect, and the notes do not state who made the telephone call, the time at which it was made, or the information given in the call. Dr. Jeffries testified that he did not believe he spoke to the resident at 6:30 p.m. because he gave orders over the telephone, and he "would have given Laurie [Nurse Wharton] orders. I wouldn't necessarily give the resident orders." Nurse Wharton could not recall if she telephoned him or delegated that task to another nurse, but she never testified that any resident called Dr. Jeffries. The resident was never deposed and never gave an affidavit. Dr. Salvino acknowledged that the summary notes do not state the time at which the resident noted that Dr. Jeffries was "on his way." Finally, Dr. Jeffries testified that the information in these summary notes would *not* have been relayed by Nurse Wharton.

The trial court, in an addendum to its order in response to Cannon's motion for reconsideration, addressed this page of summary notes. The trial court correctly noted that the summary is "completely silent regarding what information was actually conveyed" in the call to Dr. Jeffries. These notes were dictated as a summary several hours after the events in question, and the *only* times noted in the entire summary were the times that Cannon's membranes initially ruptured, her arrival at the hospital, the time at which a cesarean was decided on, and the delivery of the infant. The entry regarding "nonreassuring" fetal heart tones appears *after* the notation of the first call to Dr. Jeffries. Moreover, the statement regarding

fetal heart tones is a past recollection recorded of a medical opinion, which is not admissible in the absence of testimony from the physician making the record. *Stoneridge Properties v. Kuper*, 178 Ga. App. 409, 412-413 (1) (343 SE2d 424) (1986). "[I]f a hospital record contains diagnostic opinions and conclusions, it cannot, upon proper objection, be admitted into evidence unless and until the proper foundation is laid, i.e., the person who entered such diagnostic opinions and conclusions upon the record must qualify as an expert and relate the facts upon which the entry was based." (Citations and punctuation omitted.) Id. at 412 (1). See also *T & M Investments v. Jackson*, 206 Ga. App. 218, 221-222 (7) (425 SE2d 300) (1992). Despite Dr. Salvino's opinion that the resident was negligent, Cannon never deposed her and never obtained an affidavit. Standing alone, the summary notes do not create an issue of fact with respect to the time at which Dr. Jeffries was notified of fetal distress. The trial court did not err in granting summary judgment on the issue of Dr. Jeffries's alleged breach of duty.

*Judgment affirmed. Barnes and Phipps, JJ., concur.*

DECIDED JULY 3, 2001.

*McKinney & Salo, Jan McKinney, Sonja L. Salo*, for appellants.
*Browning & Tanksley, Henry D. Green, Jr., Hall, Booth, Smith & Slover, John E. Hall, Jr., Ashley D. Phillips, Mark A. Inman*, for appellees.